UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

PANJIVA, INC., et al.,

                Plaintiffs,

      -v-

UNITED STATES CUSTOMS AND
BORDER PROTECTION, et al.,

                Defendants.

17-CV-8269 (JPO)

OPINION AND ORDER

J. PAUL OETKEN, District Judge:

      Plaintiffs Panjiva, Inc. and Trade Data Services, Inc. d/b/a ImportGenius (collectively, "Panjiva") bring this action against Defendants the United States Customs and Border Protection ("CBP") and the United States Department of Treasury (collectively, "the Government") under the Freedom of Information Act, 5 U.S.C. § 552 *et seq.* ("FOIA"), the Administrative Procedure Act, 5 U.S.C. § 701 *et seq.* ("APA"), and the Tariff Act of 1930, 19 U.S.C. § 1431(c). (Dkt. No. 1 ("Compl.") ¶ 1.) Plaintiffs assert that CBP unlawfully failed to comply with the requirements of FOIA in response to Plaintiffs' requests for data from aircraft cargo manifests. (Compl. ¶¶ 3–4.) Plaintiffs further assert that CBP and the Treasury violated the Tariff Act and the APA by denying access to aircraft cargo manifest information and failing to promulgate regulations to facilitate public access to such information. (Compl. ¶ 5.)

      Defendants now move to dismiss the Complaint in part under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted. (Dkt. No. 21.) For the reasons that follow, Defendants' motion is granted.

## I.    Background

      The Court draws the following facts from the Complaint, which are taken as true for the purpose of resolving this motion to dismiss.

Plaintiffs Panjiva and ImportGenius are companies that seek to serve the global trade community and improve efficiency and decision-making in global commerce by aggregating and analyzing data from a number of sources, including U.S. customs shipment data from CBP. (Compl. ¶¶ 11–12.) At issue in this suit are "aircraft cargo manifests," which contain information regarding airborne cargo shipments entering the United States. (Compl. ¶¶ 1, 25.) CBP has the statutory authority to require that aircraft entering the United States submit these cargo manifests, as well as the authority to regulate the contents of and submission procedures for these manifests. *See* 19 U.S.C. § 1431(b), (d); 19 C.F.R. §§ 122.48, 122.48a(a).

Plaintiffs have each submitted FOIA requests seeking aircraft manifest information from CBP. Specifically, on January 26, 2015, ImportGenius submitted a FOIA request to CBP seeking "access to and copies of the portions of ALL aircraft manifests for inbound shipments form [sic] January 1, 2014 to July 31, 2014 that have been designated for public disclosure by 19 U.S.C §1431(c)." (Compl. ¶ 32.) CBP denied ImportGenius's request. (Compl. ¶ 40.) ImportGenius appealed, and CBP again declined to respond to the request because "doing so would impose an unreasonable burden upon the agency." (Compl. ¶ 48.) Similarly, on January 17, 2017, Panjiva submitted a FOIA request to CBP seeking "access to and copies of the portions of ALL aircraft manifests for inbound shipments from December 5, 2016 to December 9, 2016 that have been designated for public disclosure by 19 U.S.C §1431(c)." (Compl. ¶ 57.) As of October 26, 2017, CBP had not made a final determination on Panjiva's request. (Compl. ¶ 66.)[1]

Panjiva filed this action in connection with those unsuccessful FOIA requests. Its claims fall into three groups: first, Panjiva asserts that CBP violated FOIA by failing to disclose the

---

[1]     The Complaint describes numerous other communications from and actions by CBP regarding these FOIA requests (*see, e.g.*, Compl. ¶¶ 42, 46, 58–59, 61), but the Court recounts only those facts necessary to resolve this motion to dismiss.

requested aircraft manifest information, failing to adhere to the statute's procedural requirements, and engaging in a pattern or practice of unlawful conduct by specifically withholding aircraft manifest information.  (Compl. ¶¶ 83–125 (Counts I–V).)  Second, in the alternative, Panjiva asserts that CBP's failure to satisfy the requirements of FOIA also violates the APA.  (Compl. ¶¶ 114–125, 148–155 (Counts V, VIII).) [2]  And third, Panjiva asserts that CBP has violated the Tariff Act and the APA by failing to disclose the information, and that the Treasury has violated the same statutes by failing to promulgate regulations to facilitate access to such aircraft manifest data.  (Compl. ¶¶ 126–147 (Counts VI–VII).)  The Government now moves to dismiss the Complaint in part, seeking to dismiss the second and third sets of claims invoking the Tariff Act and the APA for failure to state claims upon which relief can be granted. (Dkt. No. 22 at 1–2.)

## II.     Legal Standard

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a plaintiff must plead factual allegations sufficient "to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The Court must accept as true all well-pleaded factual allegations in the complaint and "draw[ ] all inferences in the plaintiff's favor." *Allaire Corp. v. Okumus*, 433 F.3d 248, 249–50 (2d Cir. 2006) (internal quotation marks omitted).  However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not

---

[2]     Count V alleges a pattern or practice of violating FOIA, and asserts that said conduct is unlawful under both FOIA and the APA.  (Compl. ¶¶ 114–125.)

suffice." *Iqbal*, 556 U.S. at 678. "[T]he duty of a court" in ruling on a motion under Rule 12(b)(6) "is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof." *Hogan v. Fischer*, 738 F.3d 509, 514 (2d Cir. 2013) (quoting *DiFolco v. MSNBC Cable LLC*, 622 F.3d 104, 113 (2d Cir. 2010)).

## III.  Discussion

The Government seeks dismissal of two sets of claims against it:  (1) claims premised on the Tariff Act and its amendments (Counts VI–VII); and (2) claims under the APA that are duplicative of Panjiva's FOIA claims (Counts V and VIII).  The Court discusses each in turn.

### A.  Tariff Act Claims

In Count VI of the Complaint, Panjiva asserts that CBP's failure to disclose the requested aircraft manifest information constitutes a violation of the Anticounterfeiting Consumer Protection Act ("ACPA").  (Compl. ¶ 129.)  Panjiva reads the ACPA to require CBP to make certain categories of information in aircraft manifests "available for public disclosure," and to permit withholding the information only if the agency invokes specific exceptions.  (Compl. ¶¶ 25–26.)  Relatedly, in Count VII, Plaintiffs assert that the ACPA required the Treasury to "establish procedures to provide access to [aircraft] manifests" and promulgate regulations to carry out the terms of the ACPA related to aircraft manifests, but it has unlawfully failed to do so.  (Compl. ¶¶ 137–140.)

The Government has moved to dismiss both of these claims, arguing that they rest on an incorrect interpretation of the Tariff Act and its amendments.  In the Government's interpretation of the relevant statutes, it is not required to publicly disclose aircraft manifests, and thus it need not adopt procedures or promulgate regulations facilitating access to aircraft manifests.  (Dkt. No. 22 at 1–2.)  The Court agrees with the Government's reading of the statutes, and therefore grants its motion to dismiss these counts.

To understand the parties' dispute, the Court first examines how the statutory provision at issue has evolved over time. The foundational statute at issue is the Smoot-Hawley Tariff Act of 1930, which required that all vessels entering the country maintain certain information in "a manifest" for customs inspection. Pub. L. No. 71-361, § 431, 46 Stat. 590, 710 (codified as amended at 19 U.S.C. § 1431(a)). Since the enactment of the Tariff Act, the statutory term "vessel" has been consistently defined to encompass anything "capable of being used, as a means of transportation in water," and the term expressly "does not include aircraft." *Id*. § 401(a), 46 Stat. at 708; 19 U.S.C. § 1401(a).

Congress amended § 431 of the Tariff Act in 1984, adding as subsection (c)(1) the requirement that a list of specified "information, when contained in such manifest, shall be available for public disclosure." Trade and Tariff Act of 1984, Pub. L. No. 98-573, Title II, § 203, 98 Stat. 2948, 2974 (codified as amended at 19 U.S.C. § 1431(c)(1)). This provision in effect created a public-disclosure requirement for vessel manifests, subject to exceptions that the Secretary of the Treasury could invoke to withhold information. *See* 19 U.S.C. § 1431(c)(2).

In July 1996, Congress amended the public-disclosure requirement in § 431(c)(1) of the Tariff Act with the enactment of the ACPA. The ACPA modified § 431(c)(1) "by inserting 'vessel or aircraft' before 'manifest.'" Pub. L. No. 104-153, § 11(1), 110 Stat.1386, 1389 (July 2, 1996). The ACPA also amended the list of specified information to be disclosed, to insert references to airports and aircraft. *Id*. § 11(2)–(4). The effect of these changes was to extend the public-disclosure requirement to encompass both vessel and aircraft manifests. As of July 2, 1996, the operative clause of § 431(c)(1) of the Tariff Act appeared thus: "Except as provided in subparagraph (2), the following information, when contained in such vessel or aircraft manifest, shall be available for public disclosure[.]"

Shortly thereafter, in October 1996, Congress amended § 431(c)(1)'s public-disclosure requirement yet again. This time, the amending statute provided that "Section 431(c)(1) of the Tariff Act of 1930 (19 U.S.C. 1431(c)(1)) is amended in the matter preceding subparagraph (A) by striking 'such manifest' and inserting 'a vessel manifest.'" Miscellaneous Trade and Technical Corrections Act, Pub. L. No. 104-295, § 3(a)(3), 110 Stat. 3514, 3515 (October 11, 1996) ("Corrections Act").

The Office of Law Revision Counsel of the U.S. House of Representatives then attempted to amend the provision in the U.S. Code that corresponds to § 431 of the Tariff Act, 19 U.S.C. § 1431, to be consistent with the July and October 1996 acts. *See* 2 U.S.C. § 285b. The resulting codification of § 431(c)(1) of the Tariff Act produced the version that still exists today:

> Except as provided in subparagraph (2), the following information, when contained in a vessel vessel or aircraft manifest, shall be available for public disclosure:
>> (A) The name and address of each importer or consignee and the name and address of the shipper to such importer or consignee, unless the importer or consignee has made a biennial certification, in accordance with procedures adopted by the Secretary of the Treasury, claiming confidential treatment of such information.
>> (B) The general character of the cargo.
>> (C) The number of packages and gross weight.
>> (D) The name of the vessel, aircraft, or carrier.
>> (E) The seaport or airport of loading.
>> (F) The seaport or airport of discharge.
>> (G) The country or origin of the shipment.
>> (H) The trademarks appearing on goods or packages.

19 U.S.C. § 1431(c)(1) (footnote omitted). As a footnote to the repetitive use of "vessel" in the operative clause, the U.S. Code states: "So in original." *Id.* at n.1.

Relying on the ACPA and the current version of the U.S. Code, Panjiva contends that the public-disclosure requirement in § 431 of the Tariff Act mandates the disclosure of both vessel and aircraft manifests. (Dkt. No. 34 at 2–5.) The Government disagrees, asserting that the

October 1996 amendment removed the requirement to disclose aircraft manifests under § 431, such that now only vessel manifests are subject to public disclosure. (Dkt. No. 22 at 7–11.) To address this question of statutory interpretation, the Court considers first the statutory text, then the application of the rule against superfluity, and finally the relevant legislative and statutory history.

### 1. Statutory Text

"When interpreting the meaning of a statute—the task we have before us—the starting point of inquiry is of course the language of the statute itself." *In re Edelman*, 295 F.3d 171, 177 (2d Cir. 2002). But this case introduces a unique wrinkle into the statutory interpretation analysis, because the parties disagree about the *content* of the relevant statutory text. Panjiva contends that the Court should rely on the text of § 431 as it appears in the U.S. Code, 19 U.S.C. § 1431. (Dkt. No. 34 at 9–10.) The Government counters that the text of the individual enactments, as they appeared in the Statutes at Large, constitutes the relevant text here for the purposes of statutory interpretation. (Dkt. No. 22 at 5–7.)

"Though the appearance of a provision in the current edition of the United States Code is 'prima facie' evidence that the provision has the force of law, it is the Statutes at Large that provides the 'legal evidence of laws[.]'" *U.S. Nat. Bank of Oregon v. Indep. Ins. Agents of Am., Inc.*, 508 U.S. 439, 448 (1993) (quoting 1 U.S.C. §§ 112, 204(a)).[3] "Accordingly, if there is a discrepancy between the two, the codified version of the law must yield to the Statutes at Large." *Washington-Dulles Transp., Ltd. v. Metro. Washington Airports Auth.*, 263 F.3d 371, 378 (4th

---

[3] The U.S. Code serves as legal evidence of the law only where Congress has enacted the specific title into positive law. Congress has not done so for Title 19. *See* 1 U.S.C. § 204(a) & note (omitting Title 19 from list of titles that have been enacted into positive law).

Cir. 2001); *see United States v. Welden*, 377 U.S. 95, 98 n.4 (1964); *Henriquez v. United States*, No. 03 CIV. 478 (DC), 2003 WL 21242722, at *2 (S.D.N.Y. May 29, 2003).

Panjiva asserts that there is no discrepancy between the Code and the individual enactments, and thus the Court can rely on the Code as the conclusive statutory text. (Dkt. No. 34 at 11–12.) Not so. In amending § 431(c)(1), the Corrections Act struck the phrase "such manifest" and substituted the phrase "a vessel manifest." Pub. L. No. 104-295, § 3(a)(3), 110 Stat. at 3515. It is undisputed that the codified provision did not execute that precise change, because making that precise change was impossible: the phrase "such manifest" no longer appeared in § 431. The Office of Law Revision Counsel tried to accommodate this impossible amendment by replacing the word "such" with "a vessel." But the fact that the Office had to deviate from the specific amendment directed by the Corrections Act demonstrates an inconsistency between the codification and the enactment. As a result, the Court must look to the text of the Statutes at Large to discern the meaning of § 431(c)(1).

The relevant Statutes at Large here are the ACPA, 110 Stat. at 1389, and the Corrections Act, 110 Stat. at 3515. In construing those statutory enactments, the Court "must begin with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose." *United States v. Kozeny*, 541 F.3d 166, 171 (2d Cir. 2008) (quoting United States v. Albertini, 472 U.S. 675, 680 (1985)). "If the statutory terms are unambiguous, we construe the statute according to the plain meaning of its words. . . . If, however, the terms are ambiguous or unclear, we may consider legislative history and other tools of statutory interpretation." *Nwozuzu v. Holder*, 726 F.3d 323, 327 (2d Cir. 2013).

In July 1996, the ACPA "insert[ed] 'vessel or aircraft' before 'manifest'" in the operative clause of § 431(c)(1). Pub. L. No. 104-153, § 11(1), 110 Stat. at 1389. The effect of this action

was to amend the phrase "such manifest" to become "such vessel or aircraft manifest." In

October 1996, the Corrections Act "str[uck] 'such manifest' and insert[ed] 'a vessel manifest'"

in the operative clause of § 431(c)(1). Pub. L. No. 104-295, § 3(a)(3), 110 Stat. at 3515.

However, the phrase "such manifest" no longer appeared in § 431(c)(1) when this amendment

was made. As a result, the Court cannot combine the ACPA and Corrections Act in a

straightforward manner to yield a single, definitive statutory text that fully incorporates both

amendments. Rather, the statutes contain contrary indications of congressional intent, which

both parties rely on to support their preferred interpretations.

Panjiva contends that the Corrections Act left the requirement to disclose aircraft

manifests untouched in the statute, because although the Corrections Act amended the reference

to a "vessel manifest" in § 431(c)(1), it did not remove the reference to "aircraft manifests."

(Dkt. No. 34 at 11.) And according to Panjiva, because Congress is presumed to know how to

amend statutes, its failure to expressly strike the reference to "aircraft manifests" in § 431(c)(1)

means that the phrase was left in intentionally. (Dkt. No. 34 at 11–12, 17 & n.7.)

The Government asserts to the contrary that in inserting the phrase "vessel manifest" into

the operative clause of § 431(c)(1) in the Corrections Act, Congress intended to limit the

public-disclosure requirement to cover only vessel manifests.[4] (Dkt. No. 22 at 7, 10.)

---

[4]     The interpretation of § 431 of the Tariff Act offered here by the Government
appears to be the CBP's long-standing interpretation of this statutory ambiguity. *See* Sharon
Yamen, *One If by Land, Two If by Sea, but Not If by Air: Implications of A Legal Difference in
Manifest Disclosure*, 37 Seton Hall Legis. J. 119, 135 n.90 (2012); Helen Atkinson, *Ambiguity
Fogs Destiny of Cargo Manifest Disclosure*, J. on Commerce (Mar. 4, 1999),
https://www.joc.com/ambiguity-fogs-destiny-cargo-manifest-disclosure_19990304.html. But the
Government's briefs do not seek any deference for its position. *Cf. Sohm v. Scholastic Inc.*, No.
16 CIV 7098 (JPO), 2018 WL 1605214, at *5 n.5 (S.D.N.Y. Mar. 29, 2018) (noting that "courts
defer to an agency's interpretation to the extent it has the 'power to persuade'" (quoting
*Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944))). It is unnecessary to decide whether any

Acknowledging that the text of the Corrections Act amendment did not precisely map onto the then-existing text of § 431(c)(1), the Government offers two potential explanations: first, that Congress was working off of the text of § 431 that pre-dated the ACPA amendment, which included the phrase "such manifest"; and second, that Congress meant to direct the replacement of all the words between "such" and "manifest" with the phrase "a vessel manifest," but in doing so Congress omitted an ellipsis. (Dkt. No. 22 at 10 n.2.)

The Court agrees that the first scenario is what likely occurred here. On its face, the Corrections Act was purporting to amend language in § 431(c)(1) as it existed prior to the ACPA.[5] Given that the ACPA was enacted only three months prior, and different committees of the Senate originated the conflicting amendments, a mistake of this nature is easy to comprehend. *Compare* S. Rep. No. 104-177, 104th Cong. (1995) (Judiciary Comm.), *with* S. Rep. No. 104-393, 104th Cong. (1996) (Finance Comm.). And if this outdated-text scenario is indeed what occurred, it would mean that when adopting the Corrections Act amendment, Congress would have understood the new text of § 431(a)(1) to refer to vessel manifests only. And, contrary to Panjiva's assertion, Congress's failure to expressly strike the phrase "aircraft manifest" under these circumstances would provide no indication of a deliberate effort to keep the words in the statute. Looking at the plain meaning of the text in conjunction with the statutory history of § 431(c)(1), therefore, the Court is inclined to favor the Government's understanding of the statute.

---

such deference would be appropriate here, however, because the Court agrees with the merits of the Government's statutory interpretation.

[5] This point is further supported by the report of the Senate Committee on Finance, regarding the Corrections Act of 1996, which demonstrates that the Committee was working off of the pre-ACPA statutory text. *See* S. Rep. No. 104-177, 104th Cong. at 43 (1995). As explained below, because the relevant statutory text here is ambiguous, the Court may consult legislative history to discern congressional intent.

Ultimately, however, the Court is faced with an amalgamation of language from incompatible statutes and left to speculate about how they came to be. The Court thus concludes that no clear meaning can be discerned from the statutory text alone. Because "the text is . . . subject to 'divergent, but plausible, constructions' on the issue of [aircraft manifests], . . . it is ambiguous in revealing Congress's intent on this subject." *Cohen v. JP Morgan Chase & Co.*, 498 F.3d 111, 117 (2d Cir. 2007) (quoting *Kruse v. Wells Fargo Home Mortgage, Inc.*, 383 F.3d 49, 58 (2d Cir. 2004)). The Court thus turns to "other tools of statutory interpretation," *Nwozuzu*, 726 F.3d at 327—namely, the rule against superfluities and legislative history—to assist in determining the best reading of § 431(c)(1).

## 2. Rule Against Superfluity

The main tool of interpretation relied on by the parties is the rule against superfluity, also known as the canon against surplusage. Under this principle, "courts must give effect to all of a statute's provisions 'so that no part will be inoperative or superfluous, void or insignificant.'" *United States v. Harris*, 838 F.3d 98, 106 (2d Cir. 2016) (quoting *Corley v. United States*, 556 U.S. 303, 314 (2009)). Therefore, where parties offer two competing interpretations of a statute, the rule against superfluities "favors that interpretation which avoids surplusage" and redundancies. *Freeman v. Quicken Loans, Inc.*, 566 U.S. 624, 635 (2012) (emphasis removed). But "[t]he canon against surplusage is not an absolute rule." *Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 385 (2013). "[O]ur hesitancy to construe statutes to render language superfluous does not require us to avoid surplusage at all costs. It is appropriate to tolerate a degree of surplusage rather than adopt a textually dubious construction that threatens to render the entire provision a nullity." *United States v. Atl. Research Corp.*, 551 U.S. 128, 137 (2007).

Panjiva contends that this canon supports its reading of the statute in two ways. First, Panjiva asserts that Congress added "aircraft manifest" to the operative clause of § 431(c)(1) in

the ACPA and never removed it; therefore, "aircraft manifest" remains in the text of statute and must be given effect. (Dkt. No. 34 at 13–14.) The Government responds that this argument is premised on the assumption that the U.S. Code furnishes the conclusive text of the provision at issue, and that on a proper reading of the statues "aircraft manifest" was removed from the operative provision by the Corrections Act. (Dkt. No. 35 at 3.) The Court agrees with the Government. Panjiva's argument that the Government's proposed construction of the text would render redundant the word "aircraft" holds weight only if the Court were to agree with Panjiva's argument that the word "aircraft" is in fact still contained in the statutory text. Where there is not a single, definitive statutory text to analyze, a surplusage argument premised on giving effect to disputed language rests on circular logic. Panjiva's first surplusage argument is thus unpersuasive because it assumes the correctness of Panjiva's position as to the more fundamental question of what the text is.

Panjiva's second surplusage argument, though more persuasive, is similarly unavailing. As discussed above, the ACPA amended the list of information subject to disclosure under § 431(c)(1) to add references to airports and aircraft. *See* 19 U.S.C § 1431(c)(1)(D)–(F). The Corrections Act subsequently amended the operative clause, but it did nothing to remove these additional references. Panjiva argues that the rule against superfluity counsels in favor of its interpretation of the statute, in order to "make sense of the continued presence of" those terms and "give them effect." (Dkt. No. 34 at 14.) The Government acknowledges that the Corrections Act did not expressly remove those terms from the statute. (Dkt. No. 22 at 11.) But it maintains that those "vestigial references" have no continuing force, because the operative clause that creates the entitlement to disclosure was amended to exclude aircraft manifests. The upshot of the Corrections Act amendment, according to the Government, was essentially to

impliedly repeal those references.  (Dkt. No. 22 at 11–12; Dkt. 35 at 5-6.)  In response, Panjiva strenuously contests whether the requirements for an implied repeal are satisfied here.  (Dkt. No. 34 at 15.)

The Court need not resolve that dispute, however, because the rule against superfluity would not lead the Court to adopt Panjiva's interpretation in any event.  This is because "the canon against superfluity assists only where a competing interpretation gives effect 'to every clause and word of a statute.'"  *Microsoft Corp. v. I4I Ltd. P'ship*, 564 U.S. 91, 106 (2011) (quoting *Duncan v. Walker*, 533 U.S. 167, 174 (2001)).  And when "Congress acts to amend a statute, we presume it intends its amendment to have real and substantial effect."  *Husky Int'l Elecs., Inc. v. Ritz*, 136 S. Ct. 1581, 1586 (2016) (quoting *United States v. Quality Stores, Inc.*, 572 U.S. 141, 148 (2014)).

Section 3(a)(3) of the Corrections Act is one such amendment.  If the Corrections Act is to be construed as having in any way substantively amended § 431(c)(1), the only plausible understanding of its effect is that it exempted airplane cargo manifests from public disclosure.  In arguing to the contrary, Panjiva offers no alternative explanation for what Congress intended § 3(a)(3) to do that is consistent with Panjiva's preferred interpretation of § 431(c)(1).[6]  (*See* Dkt. No. 22 at 7; Dkt. No. 35 at 5.)  Nor can the Court think of any.  Because Panjiva's alternative

---

[6]    In arguing that the legislative history of the Corrections Act does not support the Government, Panjiva offers one brief explanation of the effect of § 3(a)(3) of the Corrections Act that is consistent with its reading of the statute.  Panjiva contends that the Corrections Act amendment clarified that "vessel manifests" refer only to *water* craft, and left the "aircraft" clause of § 431(c)(1) unaffected.  (Dkt. No. 34 at 20.)  But given the Tariff Act's already consistent and clear definition of "vessel," this clarification posited by Panjiva would be equally "superfluous, void or insignificant."  *Harris*, 838 F.3d at 106 (quoting *Corley*, 556 U.S. at 314).  As such, this implausible explanation fails to get off the ground.

interpretation of § 431(c)(1) would render the Corrections Act amendment entirely superfluous, Panjiva cannot benefit from the rule against superfluity. *See Microsoft Corp.*, 564 U.S. at 106.

In this case, because some superfluity is unavoidable, the Court prefers the interpretation that produces redundancies which do less violence to the statutes overall. As between select references in a descriptive list, 19 U.S.C. § 1431(c)(1)(D)–(F), or, alternatively, an entire provision amending the operative clause governing the statutory entitlement at issue, Pub. L. No. 104-295, § 3(a)(3), 110 Stat. at 3515, this principle favors the interpretation that gives effect to the latter. The Government's interpretation of § 431(c)(1) thus avoids the more significant surplusage.

### 3. Legislative History

"Where statutory language is ambiguous, we may consider legislative history, but in doing so, we must 'construct an interpretation that comports with [the statute's] primary purpose and does not lead to anomalous or unreasonable results.'" *Carlin v. Davidson Fink LLP*, 852 F.3d 207, 214 (2d Cir. 2017) (quoting *Puello v. Bureau of Citizenship & Immigration Servs.*, 511 F.3d 324, 327 (2d Cir. 2007)) (alterations in original). Both parties invoke statements from the legislative history of the Tariff Act's amendments to support their interpretations of § 431(c)(1). But overall, the legislative history further supports the Government's reading of the statute.

Panjiva relies on a report regarding the ACPA from the Senate Judiciary Committee to argue that Congress clearly intended to extend the public-disclosure requirement to aircraft manifests. (Dkt. No. 34 at 19.) The report expressly states that ACPA § 11 "eliminates the unwarranted and out-of-date distinction between information required [to be publicly disclosed] about goods shipped by sea as compared to goods shipped by air." S. Rep. No. 104-177, 104th Cong. at 11 (1995). The Government also invokes a Senate report, from the Committee on Finance, to support its argument that Congress intended the Corrections Act to limit public

disclosure to vessel manifests only.  (Dkt. No. 22 at 8.)  The report explained that the relevant

provision in the Corrections Act "amends section 431(c)(1) of the Tariff Act of 1930 to clarify

that the reference in the section is to vessel manifests and not to other types of manifests."  S.

Rep. No. 104-393, 104th Cong. at 3 (1996).

Panjiva challenges the Government's reliance on this statement, calling it a "single,

somewhat ambiguous sentence."  (Dkt. No. 34 at 20.)  The Court disagrees with that

characterization.  To the extent Panjiva briefly attempts to offer alternate explanations for the

meaning of the statement (Dkt. No. 34 at 20–21), the Court is unpersuaded.  Not only is the

statement clear evidence that the Corrections Act amendment was enacted to restrict the scope of

§ 431(c)(1), but the Finance Committee report contains other evidence confirming congressional

intent to do so.  The report concludes with a section demonstrating the changes to be made to

existing law, showing "existing law to be omitted . . . enclosed in black brackets" and "new

matter . . . printed in italic."  S. Rep. No. 104-393 at 37.  This section of the report represents

§ 431(c)(1) as follows:  "(c)(1) Except as provided in subparagraph (2), the following

information, when contained in [such manifest], *a vessel manifest* shall be available to public

disclosure: . . . ."  S. Rep. No. 104-393 at 43.  This confirms that the committee understood that

the version of § 431(c)(1) that would exist after its amendment would cover vessel manifests

only, and that it would omit any reference to aircraft manifests from the operative clause of

§ 431(c)(1).

Ultimately, both parties have invoked legislative history demonstrating clear indications

of contradictory congressional intent.  The Senate Judiciary Committee intended the ACPA to

extend the public-disclosure requirement to aircraft manifests.  And the Senate Finance

Committee intended just the opposite, namely for the Corrections Act to limit the requirement to

vessel manifests only. "It is well established that 'when two statutes are in irreconcilable conflict, we must give effect to the most recently enacted statute since it is the most recent indication of congressional intent.'" *California Pub. Employees' Ret. Sys. v. WorldCom, Inc.*, 368 F.3d 86, 104 (2d Cir. 2004) (quoting *In re Ionosphere Clubs, Inc.,* 922 F.2d 984, 991 (2d Cir. 1990)). The same principle applies where parties invoke conflicting legislative history from different statutes, which here dictates giving effect to Congress's intent to restrict the public-disclosure requirement in § 431(c)(1) to vessel manifests only.

### 4. Subsequent Legislative and Statutory History

In addition to legislative history from the enactment of the APA and Corrections Act, the parties also invoke subsequent legislative and statutory history to support their readings of § 431. "[S]ubsequent legislative history will rarely override a reasonable interpretation of a statute that can be gleaned from its language and legislative history prior to its enactment." *Doe v. Chao*, 540 U.S. 614, 626–27 (2004) (quoting *Solid Waste Agency of Northern Cook Cty. v. Army Corps of Engineers*, 531 U.S. 159, 170 n.5 (2001)). In particular, "discarded legislative proposals are seldom useful in interpreting an existing statute." *United States v. Giffen*, 326 F. Supp. 2d 497, 505 (S.D.N.Y. 2004).

The Government relies on one such discarded legislative proposal from the subsequent legislative history of the Tariff Act. In 1998, Congress was considering a bill that proposed to return § 431(c)(1) to the language of the ACPA, and thereby specifically provide for aircraft manifest disclosure. *See* H.R. 4342, 105th Cong. § 1001(b)(11) (Aug. 4, 1998) (as passed by House of Representatives). The amendment passed the House, but was taken out of the bill before it was voted on by the Senate. *See* H.R. 4342, 105th Cong. § 1001(b)(11) (as reported by S. Comm. on Finance, Sept. 29, 1998). The Government reasons that this proposed amendment casts doubt on Panjiva's reading of the statutes, because if Panjiva were correct the proposed

amendment "would have been wholly necessary." (Dkt. No. 35 at 7–8.) The Court notes the limited usefulness of this type of evidence, given that "[a] bill can be proposed for any number of reasons, and it can be rejected for just as many others." *Solid Waste Agency of N. Cook Cty.*, 531 U.S. at 170. But to the extent that this rejected amendment can be said to illuminate congressional intent, it further supports the Government's interpretation.

The parties also invoke subsequent statutory history in support of their positions. For its part, Panjiva points out that although two additional miscellaneous trade acts have been enacted since 1996, neither has amended § 431(c)(1). Panjiva reasons that if not expressly striking "aircraft manifests" was indeed an oversight in the Corrections Act of 1996, Congress would have fixed the resulting ambiguity in a subsequent statute; its failure to do so, according to Panjiva, is evidence that Congress intended to leave the public-disclosure requirements applicable to aircraft manifests. (Dkt. No. 34 at 17 n.7.) The problem with this argument, however, is that it again assumes the correctness of Panjiva's position; *i.e.*, that the phrase "aircraft manifests" still appears in the operative clause. But it does not make it any more likely that Panjiva's reading of the statute is actually correct. The Court therefore declines to draw any inference in Panjiva's favor from Congress's inaction.

The Government also relies on subsequent statutory history, emphasizing that "Congress has very purposefully maintained a distinction in the treatment of goods shipped by sea and by air" in statutes following the Corrections Act of 1996. (Dkt. No. 35 at 8–9 (citing Aviation and Transportation Security Act of 2001, Pub. L. No. 107-71, § 110(f), 115 Stat. 597; Maritime Transportation Security Act of 2002, Pub. L. No. 107-295, 116 Stat. 2064); Trade Act of 2002, Pub. L. 107-210 § 343(b), 116 Stat. 933).) Distinguishing between aircraft and vessel manifests for purposes of public disclosure, according to the Government, is thus consistent with how

Congress distinguishes between air and waterborne cargo in other ways.  (*Id.*)  The Court concludes that reliance on these subsequent enactments further supports the Government's reading of the statute, by showing that this interpretation "does not lead to anomalous or unreasonable results."  *Carlin*, 852 F.3d at 214 (quoting *Puello*, 511 F.3d at 327).

\* \* \*

In sum, the Court concludes that the Government's reading of § 431(c)(1) of the Tariff Act is correct.  Consideration of the text of the relevant statutes—in conjunction with the rule against superfluity, legislative history, and subsequent legislative and statutory history—supports interpreting the operative clause to provide for the public disclosure of vessel manifests only.  As a result, Panjiva is not entitled to the disclosure of information from aircraft manifests under § 431(c)(1), and the Treasury had no duty to adopt procedures and regulations to facilitate such disclosure.  Therefore, Counts VI and VII of the Complaint will be dismissed for failure to state a claim upon which relief can be granted.

## B.     APA Claims

The Government also seeks to dismiss Counts V and VIII of the Complaint, to the extent that those claims rely on the APA to seek relief available under FOIA.  (Dkt. No. 22 at 12–13.) Count VIII asserts that CBP's failure to issue timely determinations on Plaintiffs' FOIA requests and to provide Plaintiffs with estimated completion dates constitutes "agency action unlawfully withheld and unreasonably delayed" and arbitrary and capricious agency action under APA § 706.  (Compl. ¶¶ 149–155.)  And Count V asserts that CBP has a pattern or practice of denying FOIA requests for aircraft manifests as "overly broad and burdensome or by mischaracterizing [such] requests as 'third party' requests" in violation of FOIA and the APA.  (Compl. ¶¶ 115, 124.)  The Court agrees that these APA claims are duplicative of Plaintiffs' FOIA claims and therefore must be dismissed.

The APA provides that "[a]gency action made reviewable by statute and final agency action *for which there is no other adequate remedy in a court* are subject to judicial review."  5 U.S.C. § 704 (emphasis added).  The requirement that "there be no other adequate remedy" for review to be appropriate under the APA "reflects Congress' judgment that 'the general grant of review in the APA' ought not 'duplicate existing procedures for review of agency action' or 'provide additional judicial remedies in situations where Congress has provided special and adequate review procedures.'"  *Citizens for Responsibility & Ethics in Wash. (CREW) v. U.S. Dep't of Justice*, 846 F.3d 1235, 1244 (D.C. Cir. 2017) (quoting *Bowen v. Massachusetts*, 487 U.S. 879, 903 (1988)).   Applying § 704, "[w]hen another statutory vehicle provides an adequate remedy in a court, claims brought under the APA are properly dismissed."  *Pereira v. United States Dep't of Justice*, No. 16 CIV. 2599 (NRB), 2016 WL 2745850, at *13 (S.D.N.Y. May 11, 2016); *see also Niagara Mohawk Power Corp. v. FERC*, 306 F.3d 1264, 1268–69 (2d Cir. 2002).

Panjiva admits that Counts V and VIII invoke the APA "to provide an alternative basis for judicial review of Plaintiffs' allegations."  (Dkt. No. 34 at 22–23.)  But it defends this approach, asserting that "[i]f for some reason the Court were to find FOIA offers no adequate remedy for the alleged specific" FOIA violations, it should allow the APA claims to proceed.  (Dkt. No. 34 at 22.)  The question for this Court is thus whether FOIA provides an "adequate remedy" for all of Panjiva's APA claims.

An alternative avenue for relief is considered an "adequate remedy" if it "offers the same relief the plaintiffs seek" under the APA.  *New York City Employees' Ret. Sys. v. SEC*, 45 F.3d 7, 14 (2d Cir. 1995).  *Compare Consol. Edison Co. of N.Y.  v. United States*, No. 98 CIV. 4155 (WK), 1999 WL 212686, at *5 (S.D.N.Y. Apr. 12, 1999) (finding that alternative did not provide "adequate remedy" because it was limited to monetary damages, where plaintiffs sought

declaratory and injunctive relief); *Larson v. United States*, No. 16 CIV. 00245 (VEC), 2016 WL

7471338, at *8–9 (S.D.N.Y. Dec. 28, 2016), *aff'd*, 888 F.3d 578 (2d Cir. 2018) (finding that

alternative provided "adequate remedy" because statute provided for monetary relief and

plaintiff sought monetary relief). "Alternative remedies need not be identical to bar review

under § 704; they need only be adequate." *Zaidan v. Tillerson*, No. 17 CIV. 3604 (CBA), 2018

WL 3769966, at *3 (E.D.N.Y. Aug. 9, 2018). And a plaintiff need not succeed on the merits of

the alternative for it to be considered "adequate." *See Rimmer v. Holder*, 700 F.3d 246, 261–62

(6th Cir. 2012); *Jones v. U.S. Dep't of Hous. & Urban Dev.*, No. 11 CIV. 0846 (RJD) (JMA),

2012 WL 1940845, at *6 (E.D.N.Y. May 29, 2012) (reasoning that an alternative was adequate

"whether or not relief is ultimately granted").

To the extent that Panjiva invokes the APA as an alternative to obtain the disclosure of

the aircraft manifest information sought in its FOIA requests, it is clear that FOIA constitutes an

adequate substitute remedy. *See CREW*, 846 F.3d at 1244–46; *Walsh v. U.S. Dep't of Veterans

Affairs*, 400 F.3d 535, 538 (7th Cir. 2005); *Cent. Platte Nat. Res. Dist. v. U.S. Dep't of Agric.*,

643 F.3d 1142, 1148–49 (8th Cir. 2011); *Rimmer*, 700 F.3d at 262.

But Panjiva also seeks declaratory and injunctive relief, in the form of: (1) a declaration

that CBP has a policy and practice of violating FOIA by mischaracterizing its requests and

denying them as burdensome, and an injunction against future use of this practice in handling

Plaintiffs' FOIA requests; (2) a declaration that CBP's failure to adhere to FOIA's determination

deadlines is unlawful, and an injunction against delayed responses in the future; and (3) a

declaration that CBP's failure to provide estimated response dates to FOIA requests is unlawful,

and an injunction requiring such estimations in the future. (Compl. ¶¶ 102, 112, 124). Prior to

dismissing these APA claims under § 704 as duplicative, the Court must determine whether FOIA provides an adequate remedy for them as well.

Courts in the District of Columbia have expressly recognized that "where a plaintiff challenges an alleged pattern and practice of violating procedural requirements of FOIA in connection with the processing of the plaintiff's FOIA requests[,] the Court has the power under FOIA and *Payne* to provide the requested declaratory and injunctive remedies." *Nat'l Sec. Counselors v. CIA*, 898 F. Supp. 2d 233, 265 (D.D.C. 2012) (quoting *Muttitt v. U.S. Cent. Command*, 813 F. Supp. 2d 221, 229 (D.D.C. 2011)). The Second Circuit has not yet recognized the existence of such an independent pattern or practice claim under FOIA. *Pietrangelo v. U.S. Army*, 334 F. App'x 358, 360 (2d Cir. 2009) (noting that the 9th and D.C. Circuits have recognized pattern or practice claims). But some courts in this Circuit have entertained such claims. *See, e.g.*, *Whitaker v. Dep't of Commerce*, No. 5:17 CIV. 192, 2017 WL 6547880, at *6 (D. Vt. Dec. 20, 2017); *New York Times Co. v. FBI*, 822 F. Supp. 2d 426, 431 (S.D.N.Y. 2011); *Pietrangelo, II v. U.S. Dep't of the Army*, No. 2:06 CIV. 170, 2007 WL 1874190, at *11–12 (D. Vt. June 27, 2007), *aff'd*, 334 F. App'x 358 (2d Cir. 2009). And other courts in this Circuit have acknowledged that declaratory or injunctive relief would be appropriate if plaintiffs successfully alleged a FOIA pattern or practice claim. *See Navigators Ins. Co. v. Dep't of Justice*, 155 F. Supp. 3d 157, 168–69 (D. Conn. 2016); *Doyle v. U.S. Dep't of Homeland Sec.*, No. 17 CIV. 2542 (KPF), 2018 WL 3597513, at *26–27 (S.D.N.Y. July 26, 2018); *Pietrangelo*, 2007 WL 1874190, at *12. *But see Offor v. EEOC*, No. 15 CIV. 3175 (ADS) (ARL), 2016 WL 3747593, at *5 (E.D.N.Y. July 11, 2016) ("[FOIA] does not authorize [an] . . . injunction against future conduct . . . ."), *aff'd*, 687 F. App'x 13 (2d Cir. 2017).

The Court concludes that FOIA is a "'special and adequate review procedure[]' that permit[s] an adequate substitute remedy" under the circumstances here. *Sharkey v. Quarantillo*, 541 F.3d 75, 90 n.14 (2d Cir. 2008) (quoting *Bowen*, 487 U.S. at 903). The administrative practices challenged by Panjiva in Counts V and VIII, and the relief sought thereunder, do not directly implicate the "'withholding [of agency records],'" but they "nevertheless fall[] within the Court's broad equitable powers under the FOIA." *Nat'l Sec. Counselors*, 898 F. Supp. 2d at 265 (quoting *Muttitt*, 813 F. Supp. 2d at 228–29). Count VIII is thus duplicative of Counts III and IV, and must be dismissed for lack of subject matter jurisdiction. And to the extent that Count V relies on the APA, it too must be dismissed in part for lack of subject matter jurisdiction. *See Larson*, 2016 WL 7471338, at *7–9 (granting motion to dismiss for adequate alternate remedy under APA § 704 for lack of subject matter jurisdiction).

## IV.     Conclusion

For the foregoing reasons, Defendants' motion to dismiss is GRANTED. Counts VI, VII, and VIII of the Complaint are hereby DISMISSED. Count V is DISMISSED IN PART.

The Clerk of Court is directed to close the motion at Docket Number 21.

SO ORDERED.

Dated: September 24, 2018
          New York, New York

_____
                              J. PAUL OETKEN
                              United States District Judge